FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA
2026 SEP -8 AM 11:33
OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff-Respondent,

v.

Case No. 8:24-CR-00033-BCB-RCC

JAVIER GUZMAN-ANDRADE,

Defendant-Movant.

DEFENDANT JAVIER GUZMAN-ANDRADE'S MOTION UNDER 28 U.S.C. 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE, WITH BRIEF IN SUPPORT

## INTRODUCTION

Javier Guzman-Andrade is serving 168 months in federal prison because his lawyer told him that an admission was free. It was not free. It cost him roughly six years, and it cost him the two provisions Congress and the Sentencing Commission designed for exactly the defendant he is: a forty-one-year-old man with zero criminal history points, no violence, no prior arrests of any kind, and no weapon ever seen in his hand.

The admission was two lines in a plea agreement. Counsel agreed that Mr. Guzman-Andrade "possessed a firearm in connection with the offense of conviction, and that such conduct qualifies the defendant for a two-level upward adjustment pursuant to U.S.S.G. § 2D1.1 (b)(1)." Filing 37 at 3. The firearm was a single-shot derringer. It was found in a room other than the room where the drugs were found. It was never observed in Mr. Guzman-Andrade's possession, never carried to a transaction, never brandished, and never connected by any witness to any act of distribution. It is the kind of ornamental novelty piece that has no operational role in a multi-pound methamphetamine business, and Mr. Guzman-Andrade is prepared to testify that this one had none.

RECEIVED
SEP - 8 2026
CLERK
U.S. DISTRICT COURT

Those two lines did three things. They added two offense levels under § 2D1.1 (b)(1). They destroyed eligibility for the zero-point offender reduction under U.S.S.G. § 4C1.1, which requires that the defendant not have possessed a firearm in connection with the offense. And they destroyed safety-valve eligibility under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, which imposes the same condition and which would have released Mr. Guzman-Andrade from a ten-year statutory floor and delivered a further two-level reduction under § 2D1.1 (b)(18). The arithmetic is not close. With the stipulation, the total offense level was 35 and the range was 168 to 210 months. Without it, the total offense level is 29 and the range is 87 to 108 months. Counsel gave away six offense levels and eighty-one months at the bottom of the range, and he received nothing for them.

The government will say this motion comes too late. That argument mistakes the date of the sentence for the date of the injury. Mr. Guzman-Andrade did not sit on this claim. He did not know he had one. His lawyer told him, in terms, that the firearm language in the plea agreement and the presentence report would not block zero-point offender relief, and that all he needed to do was file an Amendment 821 motion once he reached federal prison. Mr. Guzman-Andrade did precisely what he was told. He arrived at FCI Sandstone, he prepared the motion himself, he signed it on August 5, 2025, and he placed it in the institution's legal mail on August 8, 2025. Filing 48.

On October 24, 2025, this Court denied that motion and explained why. The reason was the plea agreement. The Court held that Mr. Guzman-Andrade "did not satisfy the requirement in subsection (7)" of § 4C1.1 "because in his plea agreement, the defendant admitted to 'possess[ing] a firearm in connection with the offense of conviction.'" Filing 49 at 4. The Court added that he was ineligible for the safety valve "for much the same reason." Filing 49 at 4 n.2. And the Court used one word that frames this entire motion: he "admittedly did not meet all the criteria." Filing 49 at 4.

Admittedly. That is the whole case. Mr. Guzman-Andrade did not fail the zero-point offender criteria because of what he did in Omaha in November 2023. He failed them because of what his lawyer wrote in December 2024 and then assured him was harmless. October 24, 2025 is the day he learned that assurance was false. Under 28 U.S.C. § 2255(f)(4), that is the day the clock started. This motion is timely, and it should be granted or, at minimum, set for an evidentiary hearing.

## BACKGROUND

On February 21, 2024, a two-count indictment issued in this District charging Mr. Guzman-Andrade with distributing 50 grams or more of actual methamphetamine on November 21 and November 27, 2023, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1). Filing 45 at 3. He was arrested on march 18, 2024, arraigned on April 4, 2024, pleaded not guilty, and was detained. Filing 45 at 3.

On December 18, 2024, Mr. Guzman-Andrade pleaded guilty to Count II pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). Filing 45 at 3. The agreement dismissed Count I, fixed the sentence at 168 months, stipulated a drug quantity of at least 1.5 but not more than 4.5 kilograms of actual methamphetamine, stipulated the § 2D1.1(b)(1) firearm adjustment, and significantly limited the right to appeal. Filing 37 at 3; filing 45 at 3-4.

The presentence report described the derringer twice, and the two descriptions do not match. Paragraph 12, reciting the prosecutor's version, states that "a single shot Deringer firearm was located in a different room from where the drugs were found." Filing 45 at 4. Paragraph 28, applying the enhancement, states that "a firearm (a derringer) was recovered in the residence in close proximity to drugs and drug proceeds." Filing 45 at 6. A weapon cannot be in a different room and in close proximity at the same time. Counsel did

not object to either paragraph, and the contradiction went into the guideline calculation unexamined.

The report calculated a base offense level of 36 on 72,954.22 kilograms of converted drug weight, added two levels for the derringer, subtracted three for acceptance of responsibility, and arrived at a total offense level of 35. Filing 45 at 6-7. With a criminal history category of I and zero criminal history points, the range was 168 to 210 months. Filing 46 at 1. In section titled "Impact of Plea Agreement." The report stated plainly that "[d]ue to the firearm enhancement he was not eligible for either the Zero Point Offender reduction or the Safety Valve reduction." Filing 45 at 10.

The Court accepted the binding plea agreement at the sentencing hearing, adopted the presentence report without change, and on March 26, 2025 imposed the stipulated 168 months followed by five years of supervised release. Filing 42; filing 43; filing 44. Judgment entered March 27, 2025. Filing 43. No notice of appeal was filed. Mr. Guzman-Andrade has stated in a sworn filing in this Court that he did not appeal because he "was not advised to by counsel." Filing 48 at 3.

Mr. Guzman-Andrade is a Spanish speaker. He had no high school diploma when he was sentenced; he earned a GED in the Bureau of Prisons. He is permanently exempt from English-as-a-second-language programming and has taken his adult continuing education courses in Spanish. He has no disciplinary history and is classified at minimum recidivism risk. He was committed to Bureau of Prisons custody on May 27, 2025 and designated to FCI Sandstone.

Before sentencing and again afterward, trial counsel told Mr. Guzman-Andrade that he would still receive zero-point offender relief notwithstanding the plea agreement and the presentence report, and that the mechanism for obtaining it was a motion under Amendment 821 filed after he arrived at his designated institution. That advice was wrong

in every particular. Amendment 821 had already taken effect sixteen months before sentencing, so there was nothing retroactive left to apply. Filing 49 at 1, 3. And the very stipulation counsel had drafted was the disqualifying fact.

Mr. Guzman-Andrade followed the instruction anyway. He filed the Amendment 821 motion pro se on August 8, 2025. Filing 48. This Court denied it on October 24, 2025, holding the plea-agreement admission disqualified him under § 4C1.1(a)(7) and, for the same reason, under § 5C1.2(a)(2). Filing 49 at 4 & n.2. That order is the first document in this case that told Mr. Guzman-Andrade his lawyer had been wrong.

## AGRUMENT

### I. THIS MOTION IS TIMELY BECAUSE THE LIMITATIONS CLOCK ON A MISADVICE CLAIM RUNS FROM THE DAY THE MISADVICE IS EXPOSED, NOT THE DAY IT IS GIVEN

#### A. SECTION 2255(f)(4) MEASURES FROM DISCOVERY OF FACTS, NOT FROM ENTRY OF JUDGMENT

Congress wrote four triggers into § 2255(f), and the statute runs from "the latest of" them. Subsection (f)(1) runs from finality. Subsection (f)(4) runs from "the date on which the facts supporting the claim or claims presented could have been disclosed through the exercise of due diligence. When (f)(4) yields a later date than (f)(1), (f)(4) governs. That is not an exception grudgingly allowed; it is the text.

The Supreme Court has applied (f)(4) exactly this way. In *Johnson v. United States*, 544 U.S. 295 (2005), the movant's claim depended on the vacatur of a prior state conviction. The Court held that the vacatur order was itself a "fact" supporting the claim under (f)(4), and that the limitations period ran from that order rather than from the federal judgment, subject to a diligence requirement. *Id.* at 302, 308. The lesson is straightforward. A fact supporting the claim is not limited to the raw historical events of the offense. It includes a

later event that first makes the claim exist as something a reasonable person could recognize and plead.

### B. THE FACT SUPPORTING THIS CLAIM IS THAT COUNSEL'S ASSURANCE WAS FALSE, AND FACT WAS NOT DISCOVERABLE BEFORE OCTOBER 24, 2025

The claim here is not that the derringer was in another room. That was in the presentence report. The claim is that counsel rendered constitutionally deficient advice by trading away § 4C1.1 and § 3553(f) for nothing and then representing to his client that nothing had been traded away. The factual predicate of that claim has two components, and neither was available to Mr. Guzman-Andrade until this Court's order.

The first component is what counsel said. Mr. Guzman-Andrade knew that. The second component is that what counsel said was false. He did not know that, and he could not have known it, because the only institution capable of resolving the question had not yet spoken. Counsel had told him that the presentence report's eligibility language was not the last word and that an Amendment 821 motion would fix it. A defendant who is told by his own lawyer that the document in his hand is not controlling has not discovered that the lawyer is wrong. He has been told the opposite by the one person the Sixth Amendment appoints to tell him.

The government will respond that the presentence report said it in black and white: "Due to the firearm enhancement, he was not eligible for either the Zero Point Offender reduction or the Safety Valve reduction." Filing 45 at 10. So, it did. And counsel told him that sentence was not the end of the analysis. That is the entire mechanism of the injury. Due diligence under (f)(4) is measured by what a reasonable person in the movant's position would do, and a reasonable non-lawyer who has been affirmatively reassured by counsel does not launch a collateral attack on counsel's competence in order to test the reassurance. He does what he was told. Mr. Guzman-Andrade did what he was told.

Consider what the contrary rule would require. It would require a Spanish-speaking defendant with no high school education to read a sealed presentence report, identify a tension between one of its paragraphs and his attorney's spoken advice, resolve that tension against his attorney, correctly diagnose a Sixth Amendment claim his attorney had every incentive not to name, and file it within twelve months. Now replace the presentence report with a sentencing transcript he never received. Now replace it with a guideline commentary note. Now replace it with a Sentencing Commission amendment history. Now replace the defendant with any of the thousands of prisoners told each year by departing counsel that some later motion will take care of it. The rule the government needs is a rule that the client must audit the lawyer, in a language he does not read, on a deadline he was never told about, in order to preserve a claim that the lawyer misled him. That is not diligence. That is a trap.

### C. MR. GUZMAN-ANDRADE WAS DILIGENT, AND THE RECORD PROVES IT

Diligence under (f)(4) is reasonable diligence, not minimum feasible diligence. The record here shows a man moving as fast as his circumstances allowed. He was committed to Bureau of Prisons custody on May 27, 2025. He drafted a pro se motion without counsel, without his case file, and without the documents he needed, and he said so on its face: he explained that he was "not in possession of the documents necessary to ascertain [his] final base level and guideline range both pre and post Amendment 821." Filing 48 at 4. He signed it on August 5, 2025 and mailed it on August 8, 2025, roughly ten weeks after arriving. He has no disciplinary history to explain any delay. When the Court denied the motion on October 24, 2025 and told him why, he pursued this remedy.

A man who files the wrong motion promptly is not a man who slept on his rights. He is a man who was pointed at the wrong door.

### D. THE TRIGGER DATE IS OCTOBER 24, 2025, AND THIS MOTION FALLS WITHIN ONE YEAR OF IT

Judgment entered March 27, 2025. No appeal was taken, so the conviction became final fourteen days later under Federal Rule of Appellate Procedure 4(b)(1)(A), and the § 2255(f)(1) period expired on April 2026. The § 2255(f)(4) period began on October 24, 2025 expires on October 24, 2026. Because § 2255(f) runs from the latest applicable trigger, and because this motion is filed within one year of October 24, 2025, it is timely. Under Rule 3(d) of the Rules Governing Section 2255 Proceedings and *Houston v. Lack*, 487 U.S. 266 (1988), the filing date is the date of deposit in the institution's legal mail system.

## II. EQUITABLE TOLLING INDEPENDENTLY PRESERVES THIS MOTION, BECAUSE COUNSEL DID OT MESCALCULATE A DEADLINE—HE SENT HIS CLIENT TO THE WRONG COURTHOUSE DOOR AND TOLD HIM IT WAS THE RIGHT ONE

### A. THE STANDARD

The AEDPA limitations period is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010). A movant qualifies by showing that he pursued his rights diligently and that an extraordinary circumstance prevented timely filing. *Id.* at 649. The limitations period is not jurisdictional. *Day v. McDonough*, 547 U.S. 198, 205 (2006); *Wood v. Milyard*, 566 U.S. 463, 466 (2012). This Court therefore has equitable authority to reach the merits, and every reason to exercise it.

### B. AFFIRMATIVE MISDIRECTION BY COUNSEL IS AN EXTRAORDINARY CIRCUMSTANCE

*Holland* itself rejected the proposition that attorney conduct can never be extraordinary. The Court held that a per se rule confining attorney misconduct to garden-variety negligence was wrong, and that sufficiently egregious professional failure can support tolling. 560 U.S. at 651-52. *Maples v. Thomas*, 565 U.S. 266, 281 (2012, competes the thought: the agency principle that binds a client to his lawyer's errors presupposes a

functioning agency, and it breaks down when the lawyer's conduct severs the relationship of trust the client reasonably believed he had.

What happened here is not miscalculation. Counsel did not add wrong. Counsel identified the wrong statute, the wrong vehicle, and the wrong timeline, and delivered all three as reassurance. He told his client that the disqualifying admission he had personally drafted would not disqualify him. He told his client that the remedy lay in a retroactivity motion under an amendment that had been in force for sixteen months before the sentencing hearing. And he told his client to wait until he reached prison to file it. Each instruction pointed away from the one remedy that was actually available, and consumed the limitations period while doing so.

### C. THIS MIGHT SOUND LIKE ORDINARY BAD LAWYERING DRESSED UP IN CONSTITUIONAL LANUAGE. IT IS NOT

The line the cases draw is between error and misdirection. *Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007), and *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), stand for the familiar rule that a client bears his attorney's ordinary mistakes. Neither case involved a lawyer who told his client that a claim did not exist and then handed him a different motion to file instead. A lawyer who misreads a calendar leaves his client free to act. A lawyer who tells his client there is nothing to act on removes the client's capacity to act at all. The first is negligence. The second is a lock on the door.

Ask the question the government must answer. What, exactly, should Mr. Guzman-Andrade have done differently between March 2025 and April 2026? Disbelieved his lawyer, on the strength of a sealed report he could not read? Retained a second lawyer, from a detention facility, with no money, to audit the first? Filed a protective § 2255 motion alleging ineffective assistance on a theory his own counsel had assured him was baseless? There is no answer. He did the only thing available to a diligent layman in his position: he

followed his lawyer's instruction, promptly, and pursued the correct remedy the moment a court told him the instruction was wrong.

## III. THE PROCEDURAL DEFENSES THE GOVERNMENT WILL RAISE DO NO REACH THESE CLAIMS

### A. THE APPEAL WAIVER DOES NOT BAR THEM

The plea agreement provides that Mr. Guzman-Andrade "agrees to significantly limit the right to appeal the conviction and sentence." Filing 45 at 4. A waiver of appellate or collateral rights does not bar a claim that the waiver itself, and the plea containing it, were the products of ineffective assistance of counsel. A defendant cannot knowingly and voluntarily bargain away his ability to challenge the very advice that produced the bargain. Enforcing the waiver against these claims would also work a miscarriage of justice: it would insulate from any review a stipulation that added six offense levels and eliminated two independent statutory and guideline benefits, in exchange for nothing.

### B. PROCEDURAL DEFAULT DOES NOT BAR THEM

Ineffective-assistance claims may be raised for the first time on collateral review, whether or not they could have been raised on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003). That rule exists precisely because these claims depend on facts outside the trial record: what counsel knew, what counsel investigated, what counsel told his client, and why. Those facts are developed here or not at all. No default applies.

### C. THE RULE 11 (c)(1)(C) STRUCTURE DOES NOT DEFEAT PREJUDICE

A sentence imposed under a binding plea agreement is ordinarily based on the guideline range the parties and the court understood to apply. *Hughes v. United States*, 584 U.S. 100, 111-12 (2018). This record makes the point concretely. The stipulated number was 168 months. The bottom of the calculated range was 168 months. Filing 46 at 1. The agreement was priced to the guidelines, and the guidelines were inflated by counsel's

stipulation. Had the range been 87 to 108 months, no competent defense lawyer would have negotiated a binding sentence at 168, and no court would have been asked to accept one.

## IV. GROUND ONE: COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN STIPULTING TO THE FIREARM ENHANCEMENT, WHICH FORFEITED ZERO-POINT OFFENDER AND SAFETY-VALVE RELIEF AND COST ROUGHLY SIX YEARS

### A. THE RULE

A defendant is entitled to counsel whose performance falls within the range of competence demanded of criminal attorneys, and to relief where deficient performance prejudices him. *Strickland v. Washington*, 466 U.S. 668, 687-888 (1984). *Strickland* applies to plea negotiation and to sentencing advocacy. *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985); *Missouri v. Frye*, 566 U.S. 134, 143-44 (2012); *Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012). At sentencing, prejudice does not require a threshold quantum of extra imprisonment; any additional time has Sixth Amendment significance. *Glover v. United States*, 531 U.S. 198, 203 (2001). And an error that raises the applicable guideline range will ordinarily suffice to show a reasonable probability of different outcome. *Molina-Martinez v. United States*, 578 U.S. 189, 198-200 (2016).

### B. THE DEFICIENCY

Three provisions were in play, and they do not use the same test.

Section 2D1.1 (b)(1) is the lenient one. Under Application Note 11(A), the two-level increase applies unless it is clearly improbable that the weapon was connected with the offense. The defendant bears the practical burden of establishing that improbability once presence is shown.

Sections 4C1.1 (a)(7) and 3553 (f)(2) are the strict ones. Each ask whether the defendant possessed a firearm in connection with the offense. Neither incorporates the clearly-improbable presumption. A defendant can fail the § 2D1.1 (b)(1) test on proximity

alone and still satisfy § 4C1.1 (a)(7) and § 3553 (f)(2), because the questions are not identical.

Competent counsel preserves that distinction. This counsel obliterated it. He drafted a stipulation that used the § 2D1.1(b)(1) formulation and the § 4C1.1. (a)(7) and § 3553 (f)(2) formulation in a single breath, agreeing that his client "possessed a firearm in connection with the offense of conviction, and that such conduct qualifies the defendant for a two-level upward adjustment pursuant to U.S.S.G. § 2D1.1 (b)(1)." Filing 37 at 3. That sentence conceded the strict standard in order to concede the lenient one. Nothing required it. The government sought a two-level adjustment; counsel could have stipulated to the adjustment alone, or objected to it outright, without also handing over the safety valve.

And there was a live objection to make. The presentence report itself supplies it. The prosecutor's own version places the derringer "in a different room from where the drugs were found." Filing 45 at 4. The guideline paragraph then asserts the opposite, that it was "in close proximity to drugs and drug proceeds." Filing 45 at 6. The weapon was a single-shot derringer, an ornamental piece of no practical utility in a distribution operation involving multiple pounds of methamphetamine. It was never observed on Mr. Guzman-Andrade's person, never present at either controlled purchase, never carried, never displayed, and never linked by any witness or surveillance to any transaction. No competent lawyer looks at a single-shot novelty pistol in a separate room, with an internal contradiction in the report, and volunteers the words "in connection with the offense" as to a client with zero criminal history points who is one adjective away from the safety valve.

### C. THE PREJUDICE, IN ARITHMETIC

With the stipulation: base offense level 36; plus, two levels under § 2D1.1 (b)(1); adjusted level 38; minus three for acceptance; total offense level 35; criminal history

category I; range 168 to 210 months; no safety valve; ten-year statutory minimum in force. Filing 45 at 6-7; filing 46 at 1.

Without the stipulation: base offense level 36; minus two under § 2D1.1 (b)(18) for satisfying the § 5C1.2 criteria; minus two under §4C1.1 as a zero-point offender; minus three for acceptance; total offense level 29; criminal history category I; range 87 to 108 months; statutory minimum inapplicable under 18 U.S.C. § 3553(f).

The difference is six offense levels and eighty-one months at the bottom of the range. It is also the difference between a mandatory ten-year floor and no floor at all. Under *Glover*, a fraction of what would establish prejudice. This is not a fraction. It is most of a decade.

## V. GROUND TWO: COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING OT CHALLENGE THE DRUG-QUANTITY ATTRIBUTION

The 72,954.22-kilogram converted drug weight that produce the base offense level of 36 rests on three components that counsel never tested.

First, untested material. The November 20 and 21 controlled purchases totaled 755.1 grams of suspected methamphetamine mixture. They "were not tested." Filing 45 at 5. They were nonetheless converted at 1,510.2 kilograms.

Second, extrapolated purity. Approximately 731.22 grams seized at the residence were also not tested. Filing 45 at 5. The report applied the 91 percent purity of a different, separately packaged exhibit to that untested material, yielding 665.41 grams of actual methamphetamine and 13,308.2-kilograms converted. Purity is not a property of a residence. It is a property of a package.

Third, currency conversion. The report took $6,335 in seized cash, applied a $,800-per-pound sale price drawn from the discovery file, and converted the money into 1,025 grams of methamphetamine mixture and 2,050 kilograms of converted weight. Filing 45 at

5. That calculation assumes every dollar in the residence was methamphetamine proceeds, at that price, from that defendant, in that period.

Counsel objected to none of it. He instead stipulated to a quantity of at least 1.5 to 4.5 kilograms of actual methamphetamine. Filing 37 at 3. A defendant is entitled to have drug quantity found on reliable evidence, and untested substances, borrowed purity, and inferred cash conversions are precisely the categories that require adversarial testing. Had the untested and extrapolated components been excluded, the converted weight would have fallen materially, with a corresponding effect on the base offense level and on the sentence the parties negotiated against it.

## VI. GROUND THREE: COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO CONSULT WITH MR. GUZMAN-ANDRADE ABOUT AN APPEAL

Counsel has a constitutional duty to consult about an appeal when a rational defendant would want to appeal or when this particular defendant reasonably demonstrated an interest in appealing, and prejudice is presumed where the failure costs the defendant an appeal he would otherwise have taken. *Roe v. Flores-Ortega*, 528 U.S. 470, 480, 484 (2000). That presumption applies even where the defendant signed an appeal waiver. *Garza v. Idaho*, 586 U.S. 232, 241-44 (2019).

Mr. Guzman-Andrade has already told this Court, in a filing signed under penalty of perjury, that he did not appeal because he "was not advised to by counsel." Filing 48 at 3. A defendant who had just been sentenced to fourteen years, who had zero criminal history points, and whose presentence report expressly recorded that a firearm adjustment had stripped him of both the zero-point offender reduction and the safety-valve, is the paradigm of client a rational lawyer consults. There were nonfrivolous issues. There was a client with everything to gain. There was, on this record, no consultation. Under *Flores-Ortega* and

*Garza*, that is deficient performance and presumed prejudice, and the remedy is a delayed appeal.

## VII. AN EVIDENTIARY HEARING IS REQUIRED

A district court must hold a hearing unless the motion, files, and record conclusively show the movant is entitled to no relief. 28 U.S.C. § 2255(b). Nothing in this record conclusively resolves what trial counsel told Mr. Guzman-Andrade about zero-point offender eligibility, when he told him, what if anything counsel investigated about the derringer before conceding it was possessed in connection with the offense, what strategic benefit counsel believed he was purchasing with that concession, or whether counsel consulted his client about an appeal. Those questions are answered by testimony from Mr. Guzman-Andrade and from trial counsel, and by production of counsel's file. Mr. Guzman-Andrade requests a hearing and appointment of counsel to conduct it.

## CONCLUSION

The Court should find the motion timely under 28 U.S.C. § 2255(f)(4) or, alternatively, equitably tolled; set the matter for an evidentiary hearing; and thereafter vacate the sentence and resentence Mr. Guzman-Andrade without the §2D1.1(b)(1) adjustment and with the zero-point offender and safety-valve reductions applied, or in the alternative grant leave to file an out-of-time notice of appeal.

Dated: September 2, 2026

Respectfully submitted,

Javier Guzman A

Javier Guzman-Andrade 08083-511
Federal Correctional Institution
P.O. Box 1000
Sandstone, MN 55072

## VERIFICATION

I, Javier Guzman-Andrade, declare under penalty of perjury under 28 U.S.C. § 1746 that the factual statements in this motion concerning my communications with trial counsel, my education and language ability, and the timing of my filings are true and correct to the best of my knowledge and recollection.

Javier Guzman A
Javier Guzman-Andrade
Reg. No. 08083-511

## CERTIFICATE OF SERVICE

I hereby certify that on 9/2/26, I served a copy of this MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE, WITH BRIEF IN SUPPORT, on the following party by depositing a true and correct copy in the United States mail, first-class postage prepaid, addressed to the Clerk of Court for the District Court of Nebraska.

Javier Guzman A
Javier Guzman-Andrade 08083-511
Federal Correctional Institution
P.O. Box 1000
Sandstone, MN 55072

Javier Guzman-Andrade 08083-511 K3
Federal Correctional Institution
P.O. Box 1000
Sandstone, MN 55072

UNITED STATES OF AMERICA FOREVER/USA
UNITED STATES OF AMERICA FOREVER/USA
UNITED STATES OF AMERICA FOREVER/USA
UNITED STATES OF AMERICA FOREVER/USA
UNITED STATES OF AMERICA FOREVER/USA
UNITED STATES OF AMERICA FOREVER/USA

RECEIVED
SEP - 8 2026
CLERK
U.S. DISTRICT COURT

⇔08083-511⇔
Clerk Of Court
Uscd.Ne.Omaha Div. #1152
111 S 18TH PLZ
Omaha, NE 68102
United States

SOLD IN COMMISSARY